THE LONDON OPERATING COMPANY v. CONTINENTAL CONSTRUCTION COMPANY *and* WADE & OEMLER

159 So. 33.
Opinion Filed December 26, 1934.

16

*Paul D. McGarry, John C. Sullivan,* and *Loftin, Stokes & Calkins,* for Appellant;

*Lewis Twyman, A. L. McCarthy, Blackwell & Gray* and *A. Y. Clement,* for Appellees.

BUFORD, J.—The appeal in this case is from final decree of foreclosure of a statutory lien in favor of the contractor who erected a building for the owner on a certain lot in Miami, Florida.

The record is voluminous but, after all is considered, the controlling question for us to determine is whether or not the lien claimant proved his case as alleged in his bill of complaint. The bill alleged that the complainant undertook to construct a hotel building in Miami for the defendant, The London Operating Company, a corporation, the contract price being $48,350.00. It is alleged that certain changes and alterations were made at the request of the defendant as the work progressed which changes resulted in the necessity for changes being made in addition to the original contract price. It alleged that the defendant had paid the contractor the sum of $20,020.88 and that there remained unpaid on the total cost of the building as per the original contract together with the agreed changes the sum of $36,817.22. The complainant alleged that it had filed

notice of lien as required by statute and had instituted its suit for the foreclosure of such lien to enforce the payment of the balance due under the contract with changes and modifications made and executed after the original contract was signed between the parties and while the building was under construction.

The bill alleges that Seminole Bond & Mortgage Company acquired a mortgage on the property while the building was under construction. Lee L. Wade and C. H. Oemler were made parties defendant because they were the architects named in the building contract and because they had filed a notice of lien for their service as such architects. It was alleged that Seminole Bond & Mortgage Company and C. A. Avant were trustees under the mortgage above referred to. The notice of lien was in the following language:

"NOTICE OF INTENTION TO HOLD LIEN

"To the London Operating Company, Inc., a Florida Corporation, and all others whom it may concern:

*Please Take Notice:*

That there remains due and unpaid to the undersigned, the sum of Thirty-six Thousand Eight Hundred Seventeen and 22/100 ($36,817.22) Dollars together with interest for lumber, labor and materials which have been entirely furnished by the undersigned and labor and materials paid for by the undersigned, which labor, lumber materials, etc., have been entirely performed and used in the erection and construction of the building on that certain piece or parcel of land situate, lying and being in Miami Beach, County of Dade, State of Florida, more particularly described as follows:

"'Lot (12) Twelve, in Block (12) twelve Ocean Beach No. 1, according to the plat thereof recorded in Plat Book

at page_____ of the Public Records of Dade County, Florida.'

"And that the undersigned intends to hold a lien upon said land and improvements thereon for the said amount of Thirty-six Thousand Eight Hundred Seventeen and 22/100 ($36,817.22) Dollars, together with interest thereon from the 20th day of February, A. D. 1930."

It was executed by Continental Construction Company, Inc., a Florida corporation, by Paul R. Prufert, President, attested by William Brown, Secretary, under the corporate seal, and was sworn to by such President and Secretary. The original contract was executed October 26, 1929, and work started thereunder immediately thereafter. The mortgage was executed January 13, 1930. The pertinent adjudications of the final decree were as follows:

"1. That the defendant, The London Operating Company, pay to the defendants, Lee L. Wade and C. H. Oemler, the sum of $969.68, as principal, together with interest thereon at the rate of 8% per annum from the 1st day of April, 1930.

"2. That the defendant, The London Operating Company, pay to the complainant, Continental Construction Company, the sum of $30,733.21, as principal, together with interest thereon at the rate of 8% per annum from the 1st day of April, 1930, such payment to be made in the manner hereinafter provided.

"3. That to secure the payment of the said sums of money to the parties, respectively, to whom the same are herein ordered paid, a lien in favor of each in the amounts named is found to exist and here decreed against that certain real estate located in the State of Florida, County of Dade, City of Miami Beach, particularly described as follows: 'Lot 12, Block 12 of Ocean Beach Addition No. 1, ac-

cording to the plat thereof on file in the office of the Clerk of the Circuit Court in and for Dade County, Florida, in Book 3 of Plats at page 11,' the lien in favor of the defendants, Wade and Oemler, being here found to be prior and superior to that in favor of the complainant, and each of said liens being superior to the rights and claims of any defendants herein and all parties claiming an interest in the said real estate subsequent to the date of the recordation of the notice of lis pendens in connection with this suit."

Oher adjudications which follow in the final decree are not material here.

It will be observed that by the terms of the decree The London Operating Company was required to pay the complainant, Continental Construction Company, the sum of $30,733.21 as principal together with interest thereon at the rate of 8% from April 1, 1930.

Pertinent parts of the bill of complaint were as follows:

"II

"That on the 26th day of October, 1929, the complainant and the defendant, The London Operating Company, entered into a written contract by which the complainant agreed to erect and construct for the said defendant, upon its said real estate, a three-story hotel to be known as 'London Arms Hotel,' for which work the said defendant in said contract agreed to pay to the complainant the specified contract price of Forty-eight Thousand Two Hundred Fifty ($48,250) Dollars, said construction being subject to alterations and additions as the work might progress and said price to vary accordingly, all of which will more fully appear from a copy of the said contract itself attached hereto, marked Exhibit 'A' and hereby made a part of the bill of complaint.

"III

"That promptly upon the execution and delivery of the said contract, the complainant went on and upon the said real estate, and entered upon the performance of the said contract in strict accordance with all of its terms and provisions, furnishing all the materials and labor neecssary to construct the building in accordance with the specifications referred to in the contract, and completed the construction of the building in accordance with the said specification and certain modifications and additions, hereinafter more specifically referred to, on the 10th day of February, 1930.

"IV

"That notwithstanding the strict observance by the complainant of the provisions of the contract, the defendant, The London Operating Company, breached the said contract on the 10th day of December, 1929, in that without justification it failed, neglected and refused to pay to the complainant a substantial portion of the amount then due to the complainant according to the estimate of the architect made on said day and the said defendant in addition to this default had made other defaults under the contract in that although large and substantial amounts have become due and payable to the complainant under the contract since the said 10th day of December, 1929, the said defendant has not paid to the complainant any part of said amounts, and has failed, neglected and refused to pay the large and substantial balance due to the complainant as will hereinafter more fully appear."

Paragraph 5 of the bill of complaint alleges as follows:

"That in accordance with the right reserved in the contract to request alterations and additions in the work as the same progressed from time to time, the defendant, The London Operating Company, in form agreeable to the con-

tract, made a written request that the complainant construct
a solarium on the top of the front portion of the building
as originally planned, said solarium to be constructed in ac-
cordance with plans and specifications prepared by the ar-
chitects and approved by the owner; that in compliance with
the request, the complainant constructed the said solarium
in all respects in accordance with the specifications covering
it; that in accordance with the provisions of the contract,
the complainant was to be paid for any such additions the
actual cost of the labor and materials required and used,
plus five per cent. (5%) thereof, any such costs to be based
upon the lowest market price, and any and all deductions
to be credited upon the contract according to the contractor's
estimated cost; that in accordance with the said provisions
of the contract charges were made on a basis of the actual
cost of all such labor and materials, and the complainant
has prepared and there will be found attached hereto,
marked Exhibit 'B' and made a part hereof, a statement
showing the labor and materials actually used in the con-
struction of the said solarium, the cost thereof and five per
cent. (5%) thereof. It will be noted that the amount of
said costs plus five per cent. (5%) aggregates exactly Six
Thousand Dollars ($6,000.00) the explanation for this round
number being found in the fact that the complainant, prior
to the completion of the construction of the solarium, made
an estimate that the amount of the cost plus five per cent.
(5%) would not exceed Six Thousand Dollars ($6,000)
and for this reason, although the cost and percentage did
in fact slightly exceed this amount, the excess is waived."

Paragraphs 6 and 7 make allegations like unto that con-
tained in paragraph 5 as to other alterations and additions
in the work which it is alleged The London Operating
Company required the complainant to make. The original

contract is the standard building contract of the American Institute of Architects and contains amongst other things the following clauses:

"Article 3. The Contract Sum.—The owner shall pay the contractor for the performance of the contract, subject to additions and deductions provided therein, in current funds as follows: Forty-eight thousand two hundred fifty dollars.

"Any additions under this contract shall be calculated on the basis of cost of labor and materials plus 5%. In determining cost, same shall be estimated on the lowest market price."

"Any deductions shall be credited as per contractor's estimated cost.

"Contractor agrees to furnish surety bond to amount of 100% of the contract price.

"Where the quantities originally contemplated are so changed that application of the agreed unit price to the quantity of work performed is shown to create a hardship to the owner or the contractor, there shall be an equitable adjustment of the contract to prevent such hardship."

"Article 6. The Contract Documents. The General Conditions of the Contract, the Specifications and the Drawings, together with this agreement, form the contract, and they are as fully a part of the contract as if hereto attached or herein repeated. The following is an enumeration of the Specifications and Drawings:

"Job No. 289—Plans—Sheets from 1 to 7 inclusive and detail drawings to be furnished.

"Specifications—Job 289—Sheets from 1 to 44 inclusive and amendments."

The general conditions of the contract contain the following clauses:

"Art. 15. Changes in the Work.—The owner, without invalidating the contract, may order extra work or make changes by altering, adding to or deducting from the work, the contract sum being adjusted accordingly. All such work shall be executed under the conditions of the original contract except that any claim for extension of time caused thereby shall be adjusted at the time of ordering such change."

"In giving instructions the architect shall have authority to make minor changes in the work, not involving extra cost, and not inconsistent with the purposes of the building, but otherwise, except in an emergency endangering life or property, no extra work or change shall be made unless in pursuance of a written order from the owner signed or countersigned by the architect, or a written order from the architect stating that the owner has authorized the extra work or change, and no claim for an addition to the contract sum shall be valid unless so ordered.

"The value of any such extra work or change shall be determined in one or more of the following ways:

"(a) By estimate and acceptance in a lump sum.

"(b) By unit prices named in the contract or subsesequently agreed upon.

"(c) By cost and percentage or by cost and a fixed fee.

"If none of the above methods is agreed upon, the Contractor, provided he receives an order as above, shall proceed with the work. In such case and also under case (c), he shall keep and present in such form as the architect may direct, a correct account of the net cost of labor and materials, together with vouchers. In any case, the architect shall certify to the amount, including reasonable allowance for overhead and profit, due to the Contractor. Pending

final determination of value payments on account of changes shall be made on the architect's certificate."

And also,

"Art. 20.  Correction of Work After Final Payment.— Neither the final certificate nor payment nor any provision in the Contract Documents shall relieve the Contractor of responsibility for faulty materials or workmanship, and, unless otherwise specified, he shall remedy any defects due thereto and pay for any damage to other work resulting therefrom, which shall appear within a period of one year from the date of substantial completion.  The owner shall give notice of observed defects with reasonable promptness. All questions arising under this article shall be decided by the architect subject to arbitration."

Other general conditions made a part of the contract were:

"*Lines.*—The owner will furnish lot stakes and bench marks for the use of the contractor.  He will be required to provide protection for same and will be held responsible for the permanency and accuracy of such lot stakes and bench marks during the execution of his work.

"On completion of the work the contractor will be required to furnish the owner a survey made by an engineer, registered in the State of Florida, which survey shall show the complete structure located on the property, the projection of all footings, cornice, belt course, etc., and the Contractor shall be responsible to the owner for any and all encroachments on adjoining property and city property."

And also:

"*Lines, Grades and Levels.*—This Contractor shall be held strictly responsible for the accurate locations of all lines and grades of foundations, wall footings, foundation walls,

columns and beams. He shall establish the building line as shown on the drawing with the various grades as given.

"All lines and grades shall be checked and approved by the Architects before commencement of any work.

"He shall establish at convenient points throughout the building permanent bench marks to be used for checking work, those bench marks to be maintained during the progress of the work."

The defense of the owner was that the building had not been constructed in accordance with the contract in many particulars and designated respects which are set out in a bill of particulars attached to the answer of the London Operating Company. The evidence was conflicting and both the Master and the Chancellor resolved the conflicts in most instances in favor of the complainant, but, as is seen from the decree, the Chancellor did not allow the complainant the full amount of his claim.

It not being made clearly to appear that the findings of the Master as approved by the Chancellor were not supported by substantial evidence, this Court will not disturb the decree on that account, it being too well settled to require the citation of authorities that in equity as well as in law every presumption is in favor of the correctness of the rulings of the trial judge and it is the duty of a party resorting to an appellate court to make the errors complained of clearly to appear if in truth they do exist.

It is contended here that the decree is erroneous because it is not based upon the case made by the bill of complaint. We do not think that that contention is tenable. The bill of complaint alleges a cause of action based upon work performed and materials furnished in accordance with a contract made and entered into between the owner and the contractor, together with alterations and modifications there-

after required by the owner and agreed to between the owner and the contractor within the purview of the terms of the original contract and the completion of the building according to the terms of the contract as modified and altered by the requirements of the owner and agreed to between the owner and the contractor during the progress of the work. The original contract clearly contemplated modifications and alterations in the plans and specifications as the work progressed and there is substantial evidence in the record to sustain the allegations of the bill of complaint.

Appellant relies upon the enunciations contained in the opinions in the case of Tallahassee Variety Works v. Brown, 106 Fla. 599, 108 Sou. 759 and 144 Sou. 848, in which we held, "Complainant may obtain relief only on case made by bill of complaint, notwithstanding answer or evidence." In that case we said:

"The clear import of the bill was to subject the separate real property of Mrs. Brown, under Section two, Article eleven, of the Constitution, to the payment of appellant's claim because it represented the price of material purchased by Mr. Brown from appellant and used with Mrs. Brown's knowledge and consent in the construction of a building on her separate property as described herein.

"It is shown that appellant recorded its notice of lien as required by law but this was not material as statutory or mechanic's and materialmen's liens as provided by Sections 3498 and 3499 Revised General Statutes of 1920 (Sections 5352 and 5353 Compiled General Laws of 1927) have no application to the liability of the separate property of a married woman under Section two, Article eleven of the Constitution, both being distinct and independent remedies. The constitutional provision does not create a lien but merely authorizes courts of equity to charge the property of

the married woman with the payments of such demands and until proceedings are brought to do this, the owner may sell and dispose of her property as the law provides. Smith v. Gauby, 43 Fla. 142, 30 So. 683; Agin v. Gainesville Planing and Coffin Co., 80 Fla. 679, 87 So. 63."

And, in the opinion on rehearing we said:

"The bill of complaint in this case definitely asserts the existence of a lien in favor of the complainant, for the materials supplied, upon the lot described and the house erected upon it which is the separate statutory property of a married woman."

Further, in the same opinion, we said:

"A materialman's lien is not created by contract. It is created by statute, nevertheless a contract with the owner or his duly authorized agent for the furnishing of the material is essential as a basis or foundation for the lien. See 50 C. J. 42 Sec. 3 and note.

"It cannot be successfully contended that because the owner of a lot knows that his contractor, with whom he had a contract for the furnishing of all materials and labor in the construction of a house and an agreed price for the structure, is purchasing material from a certain materialman and raises no protest or even makes payments at times to the materialman at the contractor's request that any semblance of contract or privity is by such means established between the owner and materialman. If the materialman seeks to establish or acquire a lien he must proceed as the statute directs.

"The allegations of the bill fail to establish the existence of a statutory lien against Mrs. Brown's property.

"There is no effort whatsoever to subject the property under the provisions of Section 2 of Article XI of the Constitution for materials used with Mrs. Brown's knowledge

or assent in the construction of the building or improvements upon her property. Indeed the allegations of the bill most liberally construed make no such case. It cannot be said in view of such allegations that she individually or through her husband caused the complainant to furnish the materials or that she purchased through the consent and co-operation of her husband such materials from the complainant. See Thrasher v. Doig, 18 Fla. 809, Schnabel v. Betts, 23 Fla. 178, 1 South. Rep. 692; O'Neil v. Percival, 25 Fla. 118, 5 South. Rep. 809; Garvin v. Watkins, 29 Fla. 151, 10 South. Rep. 818; Nutt v. Codington, 34 Fla. 77, 15 South. Rep. 667; Macfarlane v. Southern Lumber & Supply Co., 47 Fla. 271, 36 South. Rep. 1029; Agin v. Gainesville Planing & Coffin Co., 80 Fla. 679, 87 South. Rep. 63."

We point out these matters to show that the opinion and judgment in that case is not applicable to the instant case.

The appellee filed cross assignments of error which challenged the correctness of the Chancellor's decree in that it was for a less amount than that claimed by the contractor and the amount shown to be due the contractor under the evidence. Whether or not the Chancellor may have found for the complainant a larger sum that that which was accorded in the decree we are not called upon to say. It is sufficient to say that there is subtantial evidence in the record to support the finding and decree of the Chancellor that the balance due the complainant for the work done and material furnished was in the sum named in the decree.

For the reasons stated the decree should be affirmed.

It is so ordered.

Affirmed.

DAVIS, C. J., and WHITFIELD, ELLIS, TERRELL, and BROWN, J. J., concur.